*E-Filed 3/24/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| E.J., a minor; by and through her guardians ad litem, TOM J. and RUTH J.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAN CARLOS ELEMENTARY SCHOOL DISTRICT,<br><br>    Defendant. | No. C 10-0166 RS<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S REQUEST FOR ENTRY OF JUDGMENT** |

## I. INTRODUCTION

Plaintiff E.J. was a student in the San Carlos Elementary School District (District). In January 2009, the District determined that E.J. was qualified to receive special education services based on her diagnoses of Asperger's syndrome and an anxiety disorder. As required by the Individuals with Disabilities Education Act (IDEA), the District developed an Individualized Education Program (IEP) to address her unique educational needs. E.J.'s parents, Tom and Ruth, the guardians ad litem in this action, rejected the offered IEP as inadequate and brought a due process complaint against the District contending that it failed to comply with its IDEA obligations. After the Administrative Law Judge (ALJ) decided all issues in favor of the District, E.J. sought review in this Court. She now moves for summary judgment on the record before the Court. The

District opposes the motion and requests entry of judgment in its favor. Based on the administrative record, as well as the parties' filings and oral argument, the motion for summary judgment is denied and judgment will be entered for defendant District.

## II. BACKGROUND

During the 2005-2006 school year, E.J. was a fifth-grade student at Tierra Linda Middle School within the District.[1] Administrative Record (AR) 72. In the summer of 2005, she began seeing a neuropsychologist, Amy Tsou, Ph.D. AR 197. In October 2005, Tsou diagnosed E.J. as having Pervasive Developmental Disorder, Not Otherwise Specified (PDD NOS), with Asperger's features. AR 1993. She provided a report to E.J.'s parents, which included the results of her testing and several recommendations. AR 1984-1999. In particular, Tsou recommended that E.J. "receive an Individual Education Program (IEP) to address her specific academic needs."[2] AR 1993. Although the parents received a copy of Tsou's report, the parties dispute whether Ruth gave it to the school.

In response to concerns raised by Ruth, the school convened a student study team (SST) meeting to address E.J.'s education. AR 631-32. The meeting was held on December 6, 2005 and included Ruth, E.J.'s teachers, the vice principal, and Vivian Garlick, who is a full-time student counselor at Terra Linda. AR 200-01, 1486. The team learned that E.J. had been diagnosed with PDD NOS with Asperger's features. AR 1486. At the meeting, a number of modifications to E.J.'s instruction and suggested actions were recorded including: extended time on tests as needed; use of relaxation techniques; use of a sign if E.J. needed to take a break during class; informing E.J.'s mother when new concepts were introduced; guided study with a partner for math; and having E.J.'s mother inform the school when she mastered particular work. *Id.* E.J. completed fifth grade with grades in the final trimester of A, A-, B+, B, B- and B-. AR 1481. The modifications from the December 2005 SST meeting were continued throughout the 2006-2007 school year, while E.J. was

---

[1] Plaintiffs' claim covers the period starting two years prior to the filing of their complaint on May 20, 2009 seeking an administrative hearing, the period generally allowed for IDEA claims. Thus, the relevant period extends from May 21, 2007 to the end of the 2008-2009 school year. Factual background prior to May 21, 2007 is included for context.

[2] Tsou further explained, "Of course, whether or not Emily is eligible for special education services or a 504 plan is determined by the IEP team at her school." AR 1993.

1  in sixth grade and she finished that school year with final trimester grades of three As, two Bs, and a
2  C+.  AR 1482.

3        At the beginning of the 2007-2008 school year, as E.J. entered seventh grade, her mother
4  emailed Garlick that E.J. had been professionally tested and found to have "nonverbal learning,"
5  obsessive compulsive disorder (OCD), and anxiety disorder.  AR 2032.  On October 19, 2007, the
6  school held another SST meeting where the team suggested further actions for E.J. including:
7  covering questions and doing one at a time on tests and assignments; using a guided study sheet and
8  a homework folder; and having E.J.'s mother note when she was overwhelmed with work.  AR
9  1488.

10        As E.J.'s difficulties in seventh grade continued, the SST met again on March 10, 2008.  AR
11  1490.  Dr. Lesley Martin, the principal at Terra Linda, attended the meeting along with Ruth, E.J.'s
12  teachers, and Garlick.  *Id.*  Under the heading "Previous Planned Actions," the meeting notes
13  include the entry "504 Plan?  Psycho Ed Ref.?" suggesting that the team had considered
14  implementing a 504 Plan[3] or referring E.J. for a special education assessment.  *Id.*  At that time, the
15  team made the decision to create a 504 Plan.  *Id.*  New modifications were adopted including: extra
16  time on tests and homework when needed; modifying E.J.'s humanities grade by excusing
17  assignments; taking tests in humanities and math when ready; and taking tests in a quiet setting as
18  needed.  At the end of E.J.'s seventh grade year, she received grades of A, B-, B-, C-, and C-.  AR
19  1483.

20        On July 2, 2008, during the summer before E.J. entered eighth grade, her parents informed
21  Garlick and Martin that E.J. was "having a terrible time with anxiety and depression anticipating the
22  beginning of 8th grade."  AR 2048.  On August 21, 2008, the school held a 504 Plan meeting.  AR
23  1500.  The 504 Plan reflects that E.J. had been diagnosed in the past year with Asperger's
24  syndrome.  *Id.*  As an additional accommodation, E.J.'s teachers were to provide her with their notes
25  after class.  *Id.*  On September 15, 2008, Ruth emailed Garlick and asked her "at what point would
26  you recommend the possibility of an IEP as I am sure that the teachers are doing the best that they

---

[3]  A 504 Plan refers to a plan developed in accordance with the Rehabilitation Act of 1973, 28 U.S.C. § 794, which provides for reasonable accommodations in education for children with disabilities.

can at this point." AR 2285. The next day, Garlick responded that she "was gathering data and information on [E.J.'s] current interventions" to determine if she needed the "further support that an IEP may provide." AR 2283. She also suggested potentially revising E.J.'s 504 Plan. *Id.*

On November 12, 2008, Ruth informed Martin that E.J. "would be out" of school at Terra Linda due to her anxiety. AR 1714. Martin responded on the same day that she had briefly met with all of E.J.'s teachers and that she was doing "quite well" in most classes. *Id.* The areas of concern were math and history. *Id.* Martin communicated to Ruth that the team would meet on November 18, 2008. *Id.* At the end of that meeting, the school made a referral for E.J. to be assessed for special education services. AP 1506.

As part of the referral, Sharon Foster conducted a psycho-educational assessment of E.J. during December 2008. AR 1531-43. Foster has been a school psychologist for the District for 12 years. AR 472. Based on her evaluation, she recommended that the IEP team consider E.J. eligible for special education services based on the Other Health Impaired criteria due to diagnoses of Asperger's syndrome and anxiety disorder including OCD and depression. AR 1543. Susan Johns, a Resource Specialist at Terra Linda, performed the academic assessment of E.J. AR 1558-63. Mitzi Geller, a speech-language pathologist, also evaluated E.J. and recommended language therapy. AR 1547-54.

After the assessments were complete, E.J.'s team held two meetings on January 22 and February 5, 2009 to develop her IEP. AR 1568-92. The IEP offered by the District involved continued placement in general education with resource support, speech/language therapy, and counseling. AR 1580. Specific services included: specialized academic instruction for three fifty-minute periods per day; speech and language services for forty-five minutes twice per week; counseling for thirty minutes per week and as needed on a daily basis; and one-to-one paraeducator support during lunch for four days per week. *Id.* The IEP also allowed for flexible settings, extra time, and modified assignments as needed and included the use of organizational aids and trial use of various educational technologies and tools. *Id.*

On January 28, 2009, Tom and Ruth sent the District a letter rejecting the proposed IEP. AR 1601-17. Meanwhile, in December 2008, E.J. had begun attending the Stanbridge Academy, a

1  private school for children with mild to moderate disabilities. AR 1024. In their January 28, 2009
2  letter, her parents stated that they were providing ten days notice of E.J.'s unilateral placement at
3  Stanbridge. AR 1601. On May 20, 2009, E.J.'s parents filed a due process complaint with the
4  state's Office of Administrative Hearings claiming that the District had failed to provide E.J. with a
5  free appropriate public education (FAPE) as required by the IDEA. AR 1277-91. The ALJ
6  conducted a six-day administrative hearing in San Carlos on September 9, 10, and 14-17, 2009 and
7  issued her decision in favor of the District on November 10, 2009. AR 1431-60.

Subsequently, E.J. filed suit in this Court seeking reversal of the ALJ's decision in its entirety. In particular, she contends that the District failed to identify her as a student requiring special education services from May 21, 2007 to January 22, 2009. When the District did refer her for special education services, E.J. claims that it failed to conduct an adequate assessment in all areas of suspected disability and offered her an IEP that was insufficient to meet her needs. Therefore, E.J. alleges that she was denied a FAPE from May 21, 2007 through the end of the 2008-2009 school year.

### III.  LEGAL STANDARD

A.   Statutory Framework

Under the IDEA and California law,[4] all children with disabilities are entitled to a FAPE. *See* 20 U.S.C. § 1412(a)(1). These statutes impose an affirmative obligation on school districts to identify, locate, and evaluate children with disabilities within their local areas (child find obligations). § 1412(a)(3). Furthermore, districts must develop, review, and revise an individualized education program (IEP) for each child with a disability. § 1412(a)(4). An IEP must, among other requirements, contain a written statement of: the child's present levels of academic achievement and functional performance; measurable annual goals in academic and functional areas; and the special education services that will be provided. § 1414(d)(1)(A).

School districts must comply with both the procedural and substantive requirements of the IDEA. *See N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008) (citations

---

[4]  The California Education Code implements the requirements of the IDEA at sections 56000 et seq.

omitted). Substantively, an IEP developed by a district for a disabled student must be "reasonably calculated to enable the child to receive educational benefits." *Id*. (quoting *Rowley*, 458 U.S. 406-07). If parents disagree with "any matter relating to the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child," they may obtain review through an impartial due process hearing by the state educational agency. 20 U.S.C. § 1415(b)(6)(A), (f). Subsequently, parties may appeal the administrative agency's decision by filing suit in district court. § 1415(i)(2)(A), (f).

B.   Standard of Review

On appeal of an administrative agency decision, the IDEA provides that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i). Congress' instruction that a court base its decision on the preponderance of the evidence means that judicial review of IDEA proceedings is not confined to the "highly deferential" standard typically accorded other agency actions. *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. Cal. 1993). At the same time, the preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Capistrano Unified Sch. Dist. v. Wartenberg by & Through Wartenberg*, 59 F.3d 884, 891 (9th Cir. Cal. 1995) (internal quotation marks omitted) (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Instead, the district court's obligation to receive the administrative record "carries with it the implied requirement that due weight shall be given to these proceedings." *Rowley*, 458 U.S. at 206.

On the question of what constitutes "due weight," the Ninth Circuit has instructed courts that they retain discretion in determining how much deference to give state educational agencies. *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). Greater deference is appropriate where the administrative findings are "thorough and careful." *See Capistrano*, 59 F.3d at 891 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994). The party

challenging a prior administrative ruling bears the burden of persuasion.  *See Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

## IV.  DISCUSSION

As an initial matter, E.J. contends that the ALJ's decision should be accorded no deference based on alleged errors in factual findings and in conclusions of law.  She argues that the ALJ committed clear error in finding that the District did not receive a copy of the 2005 Tsou report, which recommended that E.J. receive an IEP.  In making this finding, the ALJ states that hundreds of pages of documents were admitted into evidence at the hearing and that none "contain any reference to the Tsou report and recommendations."  AR 1436.  E.J., however, points to the December 6, 2005 SST meeting summary.  It includes the notation, "tested by Kaiser Sept./Oct. 2005 diagnosed Pervasive Developmental Disorder w/mild Aspergers."  AR 1486.  Thus, according to E.J., the ALJ misstated the factual record.

At the administrative hearing, Garlick testified that the December 6, 2005 SST meeting notes were in her handwriting.  AR 631.  She further stated that she believed the information regarding the Kaiser diagnosis came from Ruth and did not recall receiving the report.  AR 633-34.  Ruth testified that she handed the original report to Garlick and also that the school "was given many copies."  AR 1077-78.  The report was not discussed in emails between Ruth and the school.  AR 1078.  Furthermore, when Ruth requested a copy of E.J.'s school file in February 2009, the complete report was not among the documents she received, nor was it listed in a printout of the contents copied.[5]  AR 838-39, 1081.  Altogether, the single reference to Tsou's diagnosis in the SST meeting notes does not contradict the ALJ's finding that the District did not receive a copy of the report.

Additionally, E.J. contends that the ALJ erred when she determined the weight and credibility of Garlick's testimony.  According to E.J., Garlick was "unable to remember virtually anything about her actions and interactions with E.J. during the Fall of 2008."  Mot. 11:5-6.  In particular, E.J. cites to excerpts from Garlick's cross-examination at the administrative hearing on September 15, 2009.  AR 741, 744, 745, 746, 747, 748, 759, 762, 770, 773, 780, 786, 787.  While

---

[5] The parties dispute the significance of one page of the 2005 Tsou report marked "draft," as well as three pages of test data found in E.J.'s school file.  AR 839, 1075-80.

Garlick displays in response to some specific questions a lack of recall, the record of her testimony does not reflect an inability to remember "virtually anything" or demonstrate that she lacked credibility as a witness. *See generally*, AR 621-69, 735-811. Although Garlick was on medical leave from the end of November 2008 to March 2009 (AR 787), she interacted significantly with both E.J. and Ruth since 2005, and the ALJ did not err in finding her testimony credible.

E.J. also argues that the ALJ misstated the law by concluding that a student must have an IEP in order to be referred for a county mental health assessment, as California Government Code section 7576(d) allows a local educational agency to make a referral based on preliminary results of such an assessment. In this case, Foster made a county mental health referral on December 9, 2008. AR 1191. At the administrative hearing, Mary Jude Doerpinghaus, the Director of Special Education for the District, testified that the county mental health agency rejected the referral, as it required an IEP to be in place. AR 1192. Even after the District offered E.J. an IEP, the agency would not accept the referral without the parents' signature. AR 1191-94. The ALJ noted on the record that the county mental health agency was not a party to the action. AR 1194. Thus, she appeared to have credited Doerpinghaus' testimony that the District attempted to make a referral based on its preliminary assessment and was rejected by the agency. Thus, any alleged error in stating the statutory requirements for obtaining a county mental health referral was not a significant factor in the ALJ's assessment of the District's conduct.

As to the remaining purported errors, for the most part E.J. fails to suggest how they materially affected the ALJ's conclusions. For instance, E.J. claims that the ALJ mischaracterized Garlick's testimony by wrongly stating that she had entered a "no harm" contract with E.J. Instead, Garlick indicated that she did not think one was necessary. AR 762. If anything, this misstatement would suggest the ALJ believed Garlick had greater concerns about E.J.'s mental health, a position that would seem to favor her case. E.J. also contends that the ALJ was mistaken in stating that the District was not obligated to provide in-home educational instruction after she was absent from Terra Linda in November 2009, but her claims do not turn on the provision of these services. Finally, the fact that the ALJ stated she was not giving a certain email any weight does not suggest that she misapplied California Government Code section 11513(c). That provision specifies that

relevant evidence shall be admitted, but does not suggest the hearing officer must accord it any particular weight.  Altogether, the record does not support E.J.'s claim that the ALJ conducted a "prejudicial and inaccurate" hearing.  Instead, the ALJ's conclusions are supported by a thorough and detailed analysis.  Accordingly, the ALJ's decision is entitled to significant weight.

Based on review of the administrative record and the parties' submissions, the District did not fail to comply with its child find obligations prior to January 22, 2009.  The evidence establishes that District personnel were responsive to the parents' concerns and were actively involved in modifying E.J.'s education.  E.J.'s teachers did not consider that she was in need of special education services.[6]  Moreover, the evidence supports the conclusion that her parents did not request referral of E.J. for an assessment prior to the team meeting on November 18, 2008.  Therefore, the District was not on notice that E.J.'s needs were greater than indicated from their observations of her performance at school.

Furthermore, the IEP offered by the District on January 22 and February 5, 2009 was sufficient to provide E.J. with a FAPE, if it had been accepted.  E.J. objects to the psycho-educational assessment performed by Foster.  In particular, she contends that the evaluation tools used by Foster failed to assess adequately her social-emotional and executive functioning.  Foster, however, testified that she was aware of concerns in these areas and that her assessment did indeed address them.  AR 483, 513.  E.J. also argues that the academic assessment performed by Johns is invalid.  She claims that Johns incorrectly scored one section of a test by failing to obtain a basal, which is a minimum number of correct answers that the student must first achieve in order to count later correct answers.  In support, she cites to ambiguous testimony by Johns: "I can't imagine that I would have not gotten basal; however, I did not mark those."  AR 599.  Even if that subsection were marked incorrectly, E.J. fails to point to testimony or evidence suggesting that the entire academic assessment was therefore unreliable.

---

[6] The District offered testimony from the following teachers, each of whom stated that they saw no reason to refer E.J. for special education services: David Higginbotham, seventh grade life science, AR 836; Marilyn Wallenstein, eighth grade math, AR 892; Daniel Castillo, eighth grade U.S. history, AR 908; Christopher Ninaltowski, seventh grade world history and seventh grade "advancement via individual determination," AR 943; Amy Silvestrini, seventh grade math, AR 958; and Jorge Zaiden, eighth grade English, AR 978.

1    E.J. alleges that the District's IEP failed to include measureable goals in all areas of need. In
2  particular, she contends that her greatest areas of need included social and emotional functioning.
3  The District counters with testimony that the IEP team members developed goals "in the areas they
4  found in their assessment of [E.J.]." AR 1185. The January 22, 2009 IEP meeting notes document
5  that the "[p]arents raised the concern about [E.J.'s] social and emotional functioning, and the staff
6  discussed ideas, as well as the hope that [E.J.'s] therapist would be able to share strategies and
7  language in order to promote consistency." AR 1581. Thus, the team was aware of the parents'
8  concern and indicated willingness to address it, even if it was not incorporated as an IEP objective.
9  Although E.J. objects that the District did not renew its referral for county mental health services,
10 Ruth and Tom rejected the District's IEP, which the county mental health agency claimed was a
11 necessary prerequisite.

12   E.J. also argues that she should have been assessed for special education services based on
13 autistic-like behaviors.[7] Foster testified that the staff reviewed the autistic-like criteria and did not
14 feel E.J. was eligible on that basis. AR 492. When Foster assessed E.J., she did not observe
15 symptoms of her being on the autistic spectrum. AR 483-84. Based on information that E.J. had
16 diagnoses of Asperger's syndrome, OCD, anxiety, and depression, E.J. was qualified for special
17 education services under the Other Health Impairment criteria. AR 492. After the February 2009
18 IEP team meeting, Foster recommended reviewing the criteria for the emotionally disturbed
19 category, based on concerns from E.J.'s parents about her emotional status. AR 492. Foster's
20 willingness to consider reviewing additional criteria for E.J.'s eligibility indicates that the IEP was
21 not regarded as static, but instead subject to modification. Furthermore, members of E.J.'s IEP team
22 testified that the program offered at the time appropriately addressed E.J.'s needs. AR 489-91
23 (Foster); AR 586 (Johns); AR 1182-85 (Doerpinghaus). In sum, the District demonstrated that it
24 developed an IEP that was reasonably calculated to provide E.J. with educational benefit.

---

[7] A student qualifies for special education services based on autistic-like behaviors if he or she exhibits any combination of, but not limited to, the following characteristics: (1) inability to use oral language for appropriate communication; (2) history of extreme withdrawal or relating to people inappropriately and continued impairment in social interaction from infancy through early childhood; (3) obsession to maintain sameness; (4) extreme preoccupation with objects or inappropriate use of objects or both; (5) extreme resistance to controls; (6) displays of peculiar motoric mannerisms and motility patterns; and (7) self-stimulating, ritualistic behavior.

Accordingly, the District did not fail to provide E.J. with a FAPE from May 21, 2007 through the end of the 2008-2009 school year.

## V. CONCLUSION

E.J.'s motion for summary judgment is denied and the District's request for entry of judgment is granted.

IT IS SO ORDERED.

Dated: 3/24/11

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE